**Steven I. PAUL, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 22A01–0706–CR–275.**

Court of Appeals of Indiana.

June 19, 2008.

Stacy R. Uliana, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

DARDEN, Judge.

*STATEMENT OF THE CASE*

Steven I. Paul brings his consolidated appeal of the sentence imposed by the trial court after his conviction by jury of aggravated battery, as a class B felony, and the trial court's order finding that Paul was not entitled to credit time for earning a second associate's degree during his incarceration.

We affirm in part, reverse in part and remand.

*ISSUES*

1. Whether the trial court erred when it allowed the jury to determine that the victim's death constituted an aggravating factor in Paul's conviction for aggravated battery, as a class B felony.

2. Whether Paul's sentence is inappropriate.

3. Whether the trial court erred when it denied Paul credit for his second associate's degree.

*FACTS*

In Paul's initial appeal, we found the facts as follows:

On November 1, 2002, Paul and his girlfriend, Noreen Cousins, decided to go to a farm and practice target shooting. En route, they stopped at a liquor store in order to purchase beer. At approximately the same time that Paul drove his truck into the liquor store parking lot, Donald Barnett drove his truck into the same parking lot. Barnett was accompanied by his wife, Lisa, and their friend Cynthia Bogard. The two trucks nearly collided in the parking lot sparking a discussion between Paul and Barnett. After the encounter with

Barnett, Paul decided to leave the area and go to a different liquor store.

Paul and Cousins exited the parking lot and were immediately stopped in traffic at the signal near the liquor store parking lot. Two vans with students from Xavier University were stopped near Paul's truck at the same traffic signal. The students were accompanied by Xavier's Associate Director for Peace and Justice Programs. The students and the college administrator watched as Cousins leaned out of the car window and began shouting at Barnett who was sitting in his truck in the parking lot. Barnett yelled back at Cousins. Then Cousins jumped from Paul's truck while Paul attempted to restrain her. Cousins confronted Barnett and Barnett exited his truck. In the ensuing confrontation, Barnett either struck Cousins or defended himself against blows lodged by Cousins. Paul then left his truck, approached Cousins and Barnett, and shot Barnett once in the lower abdomen with a handgun, causing a fatal injury. Barnett took a few steps away from Paul, and Paul shot Barnett again in the shoulder area.

Paul and Cousins retreated to Paul's truck. When the traffic signal turned green, Paul "quickly accelerated and drove down the street." The Xavier students and the administrator memorized Paul's license plate and telephoned the police. Shortly after a police radio broadcast of the truck description, Captain Keith Whitlow of the New Albany Police Department observed Paul driving the truck. Captain Whitlow followed Paul's truck. Paul abruptly turned, struck a tree, exited the truck, jumped over a privacy fence, and escaped. On foot, Captain Whitlow followed in the direction he surmised Paul had been going, then doubled back to Paul's truck. Captain Whitlow saw "an African American woman there next to the passenger side of that truck." She was crying and seemed upset. Because Captain Whitlow was unsure whether she was the shooter, he placed her in handcuffs. Then Captain Whitlow observed "a tall dark skinned gentle[man] walking" toward him with his hands raised. Tr. p. 683. Captain Whitlow determined Paul's identification. After additional officers arrived, Paul led them to the gun he had used to shoot Barnett.

On November 6, 2002, Paul was charged with murder. On November 26, 2002, Paul tendered his "Notice of Intent to Interpose the Defense of Self Defense and Defense of Another." . . . .

Paul's jury trial was held over the course of six days in March and April 2004. Interspersed in the trial, both the State and the defense alluded to Barnett's race and the socio-economic differences among Paul, Barnett, and Cousins. For instance, Bogard testified that she, Lisa, and Barnett went to Louisville on the day of the incident in order to buy crack cocaine. Defense counsel asked Bogard whether they went to a black community in Louisville. Bogard also testified that Cousins had called Bogard, Lisa, and Barnett a "bunch of crack heads[,]" to which defense counsel offered rhetorically: "[S]he was right, wasn't she?" Paul testified as to his family and background, including that he was a student, his father was a retired physician, and his mother was a professor. During closing argument, defense counsel referred to Barnett's "black hand . . . grabbing a very black girl wearing a black sweatshirt." In closing arguments, without objection, the deputy prosecutor noted that the law protects "everybody," including "black men at a liquor store who have used cocaine."

At the close of the evidence, the jury was instructed that Paul was charged only with murder, but, in the event the State failed to prove the elements of murder, the jury could consider one of the lesser included offenses of murder, including, "voluntary manslaughter, reckless homicide, aggravated battery, or involuntary manslaughter...." April 6, 2004, the jury returned a guilty verdict to aggravated battery, a class B felony.

*Paul v. State,* No. 22A04–0408–CR–442, slip op. at 2–5, 827 N.E.2d 659 (Ind.Ct. App. April 26, 2005) (internal citations omitted). The trial court conducted a sentencing hearing on May 6, 2004. It found

the following aggravating factors: (1) The injury sustained by Donald Barnett was death, the ultimate battery; (2) Donald Barnett was shot in the back while moving away after the fatal shot was fired; (3) The shooting occurred in broad daylight at a busy public place and an intersection endangering many people; (4) Donald Barnett was not the aggressor in this case; (5) The shooting occurred after Noreen Cousins was out of harms [sic] way,

and that there were "no mitigating factors." *Id.* at 6. The trial court ordered Paul to serve a twenty-year sentence, with one year suspended to probation.

In his appeal, Paul argued prosecutorial misconduct and that he had been improperly sentenced in violation of the constitutional considerations articulated in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *Smylie v. State,* 823 N.E.2d 679 (Ind.2005). We affirmed his conviction but found that he was entitled to application of the sentencing holdings of *Blakely, Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Smylie.* Thus, no sentence greater than the presumptive sentence [1] could stand "because the aggravating circumstances upon which the trial court relied were not found by a jury." Slip op. at 13. Accordingly, we remanded "to the trial court with instructions to impose the presumptive sentence or less, ... or for a sentencing hearing that comports with *Apprendi, Blakely,* and *Smylie.*" *Id.*

On July 11, 2005, the State filed in the trial court a notice of its intent to prove to a jury various aggravating factors. As subsequently amended, the State alleged the following aggravating factors: (1) that the harm, injury, loss or damage suffered by the victim of the offense was significant and greater than the elements necessary to prove the commission of aggravated battery in that the injury sustained by Barnett "was death"; (2) that harm, injury, loss or damage suffered by the victim was significant and greater than the elements necessary to prove the commission of aggravated battery in that Barnett was shot in the back as he was running away; (3) that the "shooting occurred in broad daylight at a busy public place"; and (4) that Barnett was unarmed. (App.126, 127 [2]). On December 19, 2005, Paul filed a motion to dismiss the aggravators alleged by the State, arguing *inter alia* that the filing of the alleged aggravators violated his double jeopardy rights, and that the alleged aggravator of Barnett's death was "improper" because the jury had "acquit-

---

**1.** At that time, the presumptive sentence for a class B felony offense was "a fixed term of ten (10) years, with not more than ten (10) years added for aggravating circumstances or not more than four (4) years subtracted for mitigating circumstances." Ind.Code § 35–50–2–

5 (amended by P.L.71–2005, § 8, effective April 22, 2005).

**2.** We use "App." to cite to the Appendix filed by Paul with his appeal of the trial court's May 24, 2007, sentencing order.

ted Paul of the death of Barnett." (App.61). On May 9, 2006, the trial court denied Paul's motion to dismiss.

On May 23, 2007, Paul filed a motion to strike the alleged aggravating factors regarding Barnett's death, asserting it was barred by collateral estoppel and double jeopardy. The motion was denied on May 24, 2007.

On April 23–25, 2007, a jury trial on the alleged aggravating factors was held. The State presented evidence that Barnett died on November 1, 2002, as a result of being shot from within close range by Paul on that day. Evidence further established that Barnett was shot at approximately 4:00 p.m. on a weekday at one of the busiest intersections in the community and that numerous people were present in the immediate vicinity at the time of the shooting. Paul took the witness stand and admitted shooting Barnett from within close range, when Barnett "was right in front of [him]"; that his shot inflicted "a significant injury" on Barnett; that Barnett was "dead because [he] shot him"; and that the shooting had taken place in a "very busy" public place during "broad daylight." (Tr. 419, 443, 444, 443).

The jury returned verdicts finding that the State had proven beyond a reasonable doubt that (1) the harm, injury, loss or damage suffered by Barnett was significant and greater than the elements necessary to prove the commission of aggravated battery, as a class B offense, in that the injury suffered by Barnett was death; and (2) that the shooting occurred in broad daylight at a busy public place. The jury found that the State had not proven beyond a reasonable doubt the other two aggravators alleged.

On May 24, 2007, the trial court conducted its sentencing hearing. Paul submitted evidence reflecting his good behavior and the higher education coursework he had undertaken during his incarceration. At Paul's request, the trial court reviewed the testimony and evidence presented at the May 2004 sentencing hearing. The trial court found no mitigating circumstances, noted the "adjudicated aggravating circumstances," and expressly found the "primary aggravating circumstance [wa]s the fact" that Paul's aggravated battery of Barnett resulted in Barnett's death. (Tr. 553, 552). It ordered that Paul serve a twenty-year sentence, with one year suspended.

Subsequently, on July 23, 2007, Paul filed a motion for educational credit time. Paul asserted that he had been awarded an associate's degree from Oakland City College on May 6, 2006, and had been awarded an educational time credit of one year, but that he had been denied additional education time credit after earning an associate's degree from Indiana University on August 31, 2006. Paul asked the trial court to order the Department of Correction ("DOC") "to grant him educational time credit for a second associate degree." (Credit App.[3] 9). On August 20, 2007, the State filed a motion for summary disposition—submitting DOC's August 19, 2005, Executive Directive # 05–29, which provided, prospectively, that as of January 1, 2006, offenders who had earned one associate's degree while incarcerated could not receive additional educational credit time for a second associate's degree earned during the same period of incarceration. The State asserted that Paul had been properly denied any additional educational credit time pursuant to the Directive. The trial court held a hearing on November 15,

---

**3.** We use "Credit App." to refer to the Appendix submitted by Paul with his appeal of the trial court's order denying Paul's motion for educational credit time.

2007. Paul submitted evidence reflecting his completed coursework at Oakland City University from the spring of 2004 through fall of 2006 terms, and at Indiana University from the fall of 2005 through spring of 2006 terms. On November 20, 2007, the trial court issued its order finding that Paul was "not entitled to educational credit time for the second associate's degree he completed and earned from Indiana University." (Credit App. 101).

On December 31, 2007, we agreed to consolidate Paul's re-sentencing appeal with his appeal regarding educational credit time.

## DECISION

### 1. Death as an Aggravating Factor

■ A sentence imposed under the presumptive sentencing scheme is a decision resting within the discretion of the trial court. *Smallwood v. State*, 773 N.E.2d 259, 263 (Ind.2002). The decision is "reviewed on appeal only for an abuse of discretion." *Id.*

■ Paul argues that the trial court erred by using Barnett's death as an aggravating factor because that death "was a consequence of Murder for which Paul was acquitted rather than of Aggravated Battery for which Paul was convicted." Paul's Br. at 8. We cannot agree.

Paul reminds us that he "must be sentenced for the crime on which he was found guilty," and that "the merits of an acquittal may not be used to enhance a sentence." Paul's Br. at 8 (citing *Gambill v. State*, 436 N.E.2d 301 (Ind.1982), and *Fugate v. State*, 516 N.E.2d 75, 79 (Ind.Ct. App.1987)). He asserts that we should consider the fact that the jury had considered five criminal offenses: murder, voluntary manslaughter, reckless homicide, aggravated battery, and involuntary manslaughter; yet it convicted him of the

"only offense ... in which Barnett's death was not an element." *Id.* He then concludes that the jury must have "believed Paul was acting in self-defense with the first, fatal shot, but not acting in self-defense with the second, non-fatal shot to the back." *Id.* at 10. Accordingly, Paul concludes that the jury must have found that the injury he inflicted when he committed the aggravated battery was "not his death, but rather the non-fatal shot in the back." *Id.* at 11.

■ We commend Paul on a creative argument. However, it requires that we speculate on the jury's thought process, which we do not do. *See Hodge v. State*, 688 N.E.2d 1246, 1249 (Ind.1997). As the trial court properly instructed the jury, the offense of aggravated battery, as a class B felony, is defined by law as occurring when a person "knowingly or intentionally inflicts injury on a person that creates a substantial risk of death." (Tr. 299, citing I.C. § 35–42–2–1.5). Thus, by definition, death can be a consequence of the offense of aggravated battery—where the "substantial risk" has been realized. Further, that the "harm, injury, loss, or damage suffered by the victim was significant, and greater than the elements necessary to prove the commission of the offense" is a statutory aggravating factor. *See*, I.C. 35–38–1–7.1(a)(1). "Death" is not a necessary element of the offense of aggravated battery as a class B felony; it is a valid aggravating factor; and death was the result of Paul's commission of aggravated battery upon Barnett. Therefore, Paul's primary argument in this regard fails.

■ Paul also argues that the use of Barnett's death as an aggravator violated his right to trial by jury because there was no jury determination that he "was legally responsible for the shot that killed Barnett," but rather "the trial court errone-

ously inferred" this fact. Paul's Br. at 13. However, he acknowledges that a defendant's sentence "may be enhanced by the nature and circumstances of the crime." *Id.* The circumstances here support the conclusion beyond a reasonable doubt that Paul knowingly or intentionally inflicted injury upon Barnett that created a substantial risk of death, and that Barnett's death resulted from his criminal act.

In related arguments, Paul urges that the trial court erred in refusing to provide the sentencing jury with his proposed instruction that defined each of the five offenses and was given to the guilt-phase jury,[4] in addition to the self-defense instructions given to the guilt-phase jury. Implicit in this argument is his underlying premise that the guilt-phase jury found him guilty of aggravated battery as a class B felony based only on the second, non-fatal wound he inflicted upon Barnett. Because his underlying premise improperly invites us to speculate on the thought process of that jury, this argument is unavailing.

Paul further argues that because the guilt-phase jury did not find beyond a reasonable doubt that Barnett's death resulted from his commission of aggravated battery upon Barnett, both double jeopardy and collateral estoppel would bar consideration by the resentencing jury of that fact as an aggravating factor. Once again, these arguments rest upon the premise that the guilt-phase jury found him guilty of aggravated battery based solely upon the second, non-fatal shot. Therefore, his arguments must fail.

As a result, we find that the trial court did not abuse its discretion when it allowed the jury to consider Barnett's death as an aggravating factor and subsequently relied upon the jury's finding in making its sentencing decision.

### 2. Inappropriate Sentence

■ Paul argues that the maximum sentence for his first criminal offense was inappropriate in light of his character and the nature of the offense. We are not persuaded.

We have the authority to revise a sentence if, "after due consideration of the trial court's decision," it is found that the sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). The burden is on the defendant to persuade the reviewing court that his sentence is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind.2007); *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind.2006).

We discern no clear argument by Paul regarding the nature of the aggravated battery offense he committed. He suggests that the trial court "did not even mention" at sentencing the jury's finding that his commission of the offense in broad daylight in a public place constituted an aggravating factor. Paul's Br. at 29. We read the trial court's statement of "adjudicated aggravating circumstances" to have included consideration of that aggravating factor. (Tr. 553, emphasis added). Paul appears to concede that it is proper to "consider[ ] Barnett's death in an appropriateness review," but then asserts that he

---

**4.** We note that although Paul argued for and tendered the guilt-phase instruction that enumerated the elements of the five possible guilt-phase felony offenses (murder, voluntary manslaughter, reckless homicide, aggravated battery, and involuntary manslaughter), he did not argue for or tender any corollary instructions (as given in the guilt-phase) that defined the alternative culpabilities specified in the elements of those offenses—"knowingly" and "reckless."

"is still not the worst offender deserving of the harshest sentence." Paul's Br. at 29.

> We have stated that if such comparisons would reserve the maximum punishment for only the single most heinous offense.... We should concentrate less on comparing the facts of this case to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character.

*Brown v. State*, 760 N.E.2d 243, 247 (Ind. Ct.App.2002), trans. denied.

Paul and Barnett met when each was driving toward a single parking spot; Paul drove away but his girlfriend then initiated a verbal and subsequent physical confrontation with Barnett. Despite the fact that this was taking place in a crowded public place during mid-afternoon, Paul's response was to take his loaded firearm and, from close range, fire a fatal shot into Barnett's abdomen and then a second shot into his back. Paul admitted that he did not see Barnett armed with any type of weapon, and that as he approached Barnett, he did not say or call out anything (such as, "Stop!") to Barnett before firing the shots. Barnett died as a result of Paul's actions when Paul responded to his girlfriend's pursuit of an argument and her subsequent physical altercation over a parking spot that Paul had already surrendered. Thus, we conclude that Paul's offense was significantly more heinous than a typical aggravated battery

As to his character, we acknowledge Paul's minimal criminal history. He urges consideration of his later surrender to the police. However, the evidence reflects that his initial response was to flee from the scene of the crime. He also urges consideration of his initial inculpatory statement to police. However, the state's evidence reflects the presence of numerous eyewitnesses who would likely testify contrary to Paul's inculpatory statement. Paul further reminds us of his good conduct and educational attainment during incarceration. However, as the State observes, good behavior "is expected of all inmates," and he has received credit against his sentence for his educational achievements. State's Br. at 16. Paul also asserts that he was remorseful. However, we note that at the first sentencing hearing, Paul testified that he was "forced to use" the gun, and "was just in the wrong place at the wrong time." (Trial Tr. 993). At the resentencing hearing, Paul expressed his "sincere regret to [his] family and the victim's family," and that he was "sorry this whole thing happened." (Tr. 540). We further note testimony at the first sentencing hearing by a physician board-certified in psychiatry, who opined that Paul could "over-exaggerate the threatening nature of a situation" such that he could "feel a threat around him which another person may not perceive in that fashion." (Trial Tr. 976). The "nature, extent and depravity" of the aggravated battery for which Paul was sentenced are consistent with this expert opinion regarding Paul's character. *Brown*, 760 N.E.2d at 247. Given the nature of the offense he committed, nothing about Paul's character renders the twenty-year sentence imposed in this case inappropriate.

### 3. Educational Credit

Finally, Paul argues that the trial court erred in denying him educational credit time for his second associate's degree because the statute and resulting DOC directive violate constitutional prohibitions against ex post facto laws as applied to him. We agree.

Both the United States Constitution and the Indiana Constitution prohibit

ex post facto laws. *Goldsberry v. State*, 821 N.E.2d 447, 464 (Ind.Ct.App.2005) (citing U.S. Const. Art. I, § 10, Ind. Const. Art. 1, § 24). The analysis is the same under both. *Id.* "To fall within the ex post facto prohibition, a law must be retrospective—that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it.'" *Lynce v. Mathis*, 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (quoting *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)).

In 2002, when Paul committed the aggravated battery offense, the statute provided simply that an incarcerated offender could earn educational credit of "one (1) year for completion of an associate's degree." I.C. § 35–50–6–3.3(d)(3). The only maximum for the earning of educational credit was "the lesser of (1) four (4) years; or (2) one-third (1/3) of the person's total applicable credit time." I.C. § 35–50–6–3.3(i).

We have found the educational credit provision to express the legislature's intent to provide offenders with an incentive to further their educations while incarcerated. *Partlow v. Superintendent*, 756 N.E.2d 978 (Ind.Ct.App.2001); *Moshenek v. Anderson*, 718 N.E.2d 811, 814 (Ind.Ct. App.1999). In *Moshenek*, we noted that the statute did "not expressly state that a person may receive a credit for completing only one" associate's degree, and held that the statute "d[id] not preclude a person from using multiple degrees of the same educational level to comprise his total credit time." 718 N.E.2d at 813, 814. Accordingly, we reversed the order denying Moshenek's claim for educational credit for his second associate's degree. Similarly, in *Partlow*, a "case very similar to *Moshenek*" in that Partlow had been denied credit for a second degree, we concluded that the statute did not limit the earning of

educational credit for an additional degree. 756 N.E.2d at 983. Therefore, we ordered that he be awarded credit for his second degree.

In *Moshenek*, we also noted that the legislature might act "to prohibit a person from receiving credit for multiple degrees," 718 N.E.2d at 814, and in *Partlow*, we indicated that the legislature might enact "limitations on educational credit one may earn while incarcerated." 756 N.E.2d at 983. Thus, in 2003, the following provision was added to the statute:

> A person may earn credit time for multiple degrees at the same education level under subsection (d) only in accordance with guidelines approved by the department of correction. The department of correction may approve guidelines for proper sequence of education degrees under subsection (d).

I.C. 35–50–6–3.3(k). Thereafter, on August 31, 2005, the DOC issued its executive directive stating that prospectively, effective January 1, 2006, offenders could not receive educational credit time for more than one associate's degree. Thereafter, the application of the statutory provision enacted in 2003 and the resulting DOC executive directive led to the denial of Paul's claim for educational credit time for his second associate's degree, awarded by Indiana University.

We find the circumstances presented herein to be directly on point with *Weaver*. There, when Weaver had committed his crime, there was in place a statutory provision for earning credit for good behavior; however, a subsequent statutory enactment "reduce[ed] the number of monthly gain-time credits available to an inmate who abide[d] by prison rules and adequately perform[ed] his assigned tasks." 450 U.S. at 33, 101 S.Ct. 960. The Supreme Court held that "[b]y definition, this reduction in gain-time accumulation lengthens

the period that someone in [Weaver]'s position must spend in prison." *Id.* It concluded that "the new provision constricts the inmate's opportunity to earn early release, and thereby makes more onerous the punishment for crimes committed before its enactment"; therefore, it ran "afoul of the prohibition against ex post facto laws." *Id.* at 35–56, 101 S.Ct. 960.

The State suggests that *Weaver* was overruled by *California Dep't of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). It cites the *Morales* footnote describing as "unnecessary" the language in *Weaver* stating that "enhancements to the measure of criminal punishment fall within the ex post facto prohibition because they operate to the 'disadvantage' of covered offenders." *Id.* at n. 3. However, *Lynce* subsequently discussed *Weaver* extensively, and emphasized that *Weaver's* ex post facto analysis turned on the issue of whether the new statute had objectively effected a lengthening of the inmate's sentence—*i.e.,* analysis of "the effect of the law on the inmate's sentence." *Lynce,* 519 U.S. at 444, 117 S.Ct. 891. We read *Lynce* to have reaffirmed the Supreme Court's analysis in *Weaver* on a claimed violation of ex post facto protections.

The State also argues that the change is not "retrospective" because the relevant date is not the date of Paul's conviction, but the date that he earned the second associate's degree—August 31, 2006. However, we find *Weaver* to be dispositive in that regard. Moreover, in *Renfroe v. State,* 743 N.E.2d 299, 301 (Ind.Ct.App. 2001), we held that the constitutional protections against ex post facto precluded application of a statutory amendment "that would effectively deprive [Renfroe] of credit time" for having completed his GED, and that he was entitled to educational credit pursuant to the statute in effect at the time he committed the offense.

When Paul committed the offense, the law provided that he could earn one year of educational credit for an associate's degree—with no limitation as to the number of such degrees except for the statutory maximum for educational credit time. After the law and DOC policy changed to limit his earning of credit to a single associate's degree, it reduced the educational credit time available to him for pursuing more than one associate's degree—by limiting him to credit for a single associate's degree. "[T]his reduction in [educational credit time] accumulation lengthen[ed] the period that [Paul] must spend in prison," constricted his "opportunity to earn early release," and "made more onerous the punishment" for the aggravated battery he committed "before enactment" of the new law and policy. *Weaver,* 450 U.S. at 33, 35–36, 101 S.Ct. 960. Inasmuch as at the time Paul committed the offense, the statute allowed him to earn more than one associate's degree and earn one year's credit for each degree, the application of the new statutory provision and DOC's policy to deny him credit for both degrees is a violation of his constitutional protections against ex post facto laws. Therefore, we reverse the trial court's order in that regard and remand to the trial court for issuance of an order to the Indiana Department of Correction consistent with this opinion.

Affirmed in part, reversed in part and remanded.

NAJAM, J., and BROWN, J., concur.