## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 18 2017, 9:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer L. Koethe
LaPorte, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Casey Mae Measles,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 18, 2017

Court of Appeals Case No.
46A03-1607-CR-1635

Appeal from the LaPorte Circuit Court

The Honorable Thomas Alevizos, Judge

Trial Court Cause No.
46C01-1509-F3-775

**Bradford, Judge.**

# Case Summary

[1] On August 27, 2015, Appellant-Defendant Casey Mae Measles shook her infant son with enough force to cause him to suffer significant injuries. As a result of this "shaking," Measles was charged with Level 3 felony aggravated battery and Level 3 felony battery. She subsequently pled guilty to and was convicted of Level 3 felony aggravated battery. In exchange for Measles's plea, Appellee-Plaintiff the state of Indiana ("the State") agreed to dismiss the remaining battery charge. The parties also agreed that Measles's sentence would be capped at eleven years. The trial court accepted Measles's guilty plea and sentenced her to an eleven-year term of imprisonment in the Department of Correction ("DOC").

[2] On appeal, Measles contends both that the trial court abused its discretion in sentencing her and that her sentence is inappropriate in light of the nature of her offense and her character. Because we disagree, we affirm.

# Facts and Procedural History

[3] In August of 2015, then-eighteen-year-old Measles lived in a home with her boyfriend; the couple's newborn son, B.; and her boyfriend's father. Measles struggled to care for B. without help from others because B. suffered from "colic really bad." Tr. Vol. II, p. 21.

[4] On the afternoon of August 27, 2015, Measles was alone with B. because "everyone else had to work." Tr. Vol. II, p. 21. Measles subsequently

explained that on this afternoon, "[B.] just wouldn't stop crying and I didn't have anybody to ask for help and I was getting really, really stressed out, so I shook him; and then I didn't -- I didn't know how bad it would turn out to be." Tr. Vol. II, pp. 21-22. Measles further explained that after she shook B., "[h]e just -- he fell asleep and then [Measles's boyfriend] came home. That's when we found out that he wouldn't wake up. He wouldn't eat, wouldn't cry." Tr. Vol. II, p. 22. Measles and her boyfriend then took B. to the hospital.

[5] On September 2, 2015, the State charged Measles with Level 3 felony aggravated battery and Level 3 felony battery. The parties subsequently entered into a plea deal, pursuant to the terms of which (1) Measles agreed to plead guilty to the Level 3 felony aggravated battery charge, (2) the State agreed to dismiss the remaining Level 3 felony battery charge, and (3) the parties agreed that they "shall argue sentencing with a minimum cap of five (5) years and with a maximum cap of 11 years." Appellant's App. Vol. II, pp. 54.

[6] The trial court conducted a sentencing hearing on June 9, 2016. During the sentencing hearing, the State presented evidence regarding Measles's initial lack of remorse, the seriousness of the injuries suffered by B., and the life-long effects of Measles's actions on B. Kimberly Gordon, the DCS case manager assigned to B.'s case, testified that, at least initially, Measles showed no remorse for her actions.

[7] Gordon further testified that immediately upon being admitted to the hospital, B. "was experiencing severe seizures and he was in a lifeless state." Tr. Vol. II,

p. 5. Doctor's explained to Gordon that B.'s condition was "due to the severe trauma that he had experienced to his head and the swelling that was going on at the time within the brain, and they noticed brain damage when they brought him in as well, that he was almost to the point of death." Tr. Vol. II, p. 5. On August 31, 2015, B. "was placed on life support." Tr. Vol. II, p. 5. Approximately ten days later, doctors "had finally got him stabilized enough to a point that he was able to move to a special needs foster home that could manage his skills -- or his problems." Tr. Vol. II, p. 5. Doctors indicated to Gordon that B.

> would need to have a two-parent home because he had to have someone with him 24/7. He needed individuals who were trained on being able to administer the special medications that he had to have, and they had to be given at specific times everyday so -- he would not be able to go into relative care or anything else.

Tr. Vol. II, p. 6.

[8] Since leaving the hospital, B. has suffered from daily seizures, some of which have been severe.

> [B.] is still now having seizure activity. He continually has seizure activity all the time. When [doctors] do EEGs he has seizure activity constantly going on even though it may not be visible to the average person. As far as what we're seeing right now, anywhere from one to three times a day he is having seizures that are visible. They are not as intense. It's more like -- it looks like if somebody like scares you or jumped out and scared you, he'll get like that shaked [sic] look and then that will be it. It's not as intense. But he has what they call infantile

spasms which are -- as the doctor described it in the beginning, they are some of the more dangerous types of spasms. Those are reducing some, but they [have] not totally gone away. He has -- they say he has epilepsy. It covers a wide range of the different types of seizure activity that he has going on in his brain. They haven't specified other than saying he has infantile spasms, what other specific type of individual ones they're seeing on the EEG. He has been taken off of -- or he's being weened off of the medication Sabril which was a medication they put him on for the infantile spasms because they had gotten so bad.[1]

Tr. Vol. II, p. 7. Doctors believe that B. will continue to suffer from seizures for the rest of his life. B. has suffered "irreversible" brain damage, which has caused "severe developmental delays." Tr. Vol. II, p. 8. Doctors are unsure of the extent of this damage because they have not be able to assess "how bad it's going to be when he starts growing up and starts accessing those other areas of his brain that are damaged." Tr. Vol. II, p. 8.

[9] B. has also experienced a problem with his left eye. The eye "tends to look straight at you. He can't -- he has trouble following and tracking with that eye." Tr. Vol. II, p. 8. "At this point, [doctors are] not able to tell" whether B. is partially (or fully) blind in that eye or merely suffers from an inability to focus. Tr. Vol. II, p. 8.

[10] B. is also "totally behind" on his developmental milestones. Tr. Vol. II, p. 9.

---

[1] B.'s treatment remains fluid because he has suffered a number of side effects, some severe, from his medications.

[B.'s] over a year old. He is not crawling yet. He is just now being able to get up on his arms, but he stiffens his hands. He doesn't open them up to try to crawl. They work with him in getting him up on his fours, but he doesn't -- he can't figure out what to do with them. As far as sitting goes -- like I said, he's over a year old. At this point he should be sitting on his own. He is not able to do that. If you try to sit him in a position, he, within a couple of seconds, will fall over if someone is not holding him or adjusting his back or something of that nature. As far as -- he is just now starting to babble a little bit, but otherwise he's basically behind on the whole scale; and also his growth has also been – he's on the low -- very low end of everything on his growth chart.

Tr. Vol. II, p. 9. As for B.'s head development, "he's only in the third percentile" and he is "within the 25th percentile or less in his other areas." Tr. Vol. II, p. 9.

[11] B. also suffered physical ailments to his neck and shoulders as a result of the trauma inflicted upon him.

From the trauma, for the longest time -- when he first came home, you know, he was about three months old. He had to be treated just like a newborn baby. He -- you had to hold his head. He could not hold -- move his head up or have the strength to hold his head. He did not have the muscle strength or anything in his neck muscles or his shoulders. It has taken quite some time to be able to -- just like I mentioned -- to get to the point where he can even put his arms up to try to hold himself and lift his head. We're just now getting to that, and it's been about a year -- or, well, you know, he's a little over a year now, so he did have severe trauma to the neck and to the muscles from the trauma.

Tr. Vol. II, pp. 9-10.

[12]     At the conclusion of the sentencing hearing, the trial court made the following
statement:

> The Court finds the following aggravating factors: The factor is
> that this -- one, that this aggravated battery was a result of shaken
> baby syndrome, now known as AHT.  The defendant was a
> person having care, custody, or control over the victim in the
> offense.  The defendant had recently violated the conditions of
> bond and that she was out on bond for a theft charge in LaPorte
> Superior Court 3 at the time of the offense.  The victim of this
> offense was less than 12 years of age, in fact, was somewhere
> around three or four months of age.
>
> On the mitigating side, she has accepted responsibility and plead
> guilty to the highest charge.
>
> The aggravators far outweigh the mitigators.  If this were a blind
> plea without indication, she would be going to the [DOC] for 14
> years.  That's what I would -- what my balance scale says.  Since
> I'm capped at 11, my question now becomes do I even accept
> this plea or do I force you guys to go to trial or come up with a
> different plea.  I don't think it's worth all of that hassle for the
> three years and the trauma that other people will have to revisit
> as a result of this.
>
> I accept your plea and I sentence you to 11 years in the [DOC];
> credit for 67 days in Credit Class B; fine and court costs of record
> only.  You're remanded to the custody of the sheriff to complete
> the balance of your executed sentence.

Tr. pp. 38-39.  This appeal follows.

# Discussion and Decision

Measles contends on appeal both that the trial court abused its discretion in sentencing her and that her sentence is inappropriate in light of the nature of her offense and her character. We will address each contention in turn.

## I. Abuse of Discretion

Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *modified on other grounds on reh'g*, 875 N.E.2d 218 (Ind. 2007). "An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.* (quotation omitted).

> One way in which a trial court may abuse its discretion is failing to enter a sentencing statement at all. Other examples include entering a sentencing statement that explains reasons for imposing a sentence-including a finding of aggravating and mitigating factors if any-but the record does not support the reasons, or the sentencing statement omits reasons that are clearly supported by the record and advanced for consideration, or the reasons given are improper as a matter of law. Under those circumstances, remand for resentencing may be the appropriate remedy if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record.

*Id*. at 490-91. A single aggravating factor may support an enhanced sentence. *Fugate v. State*, 608 N.E.2d 1370, 1374 (Ind. 1993).

[15] In sentencing Measles, the trial court found the following aggravating factors: (1) the aggravated battery was the result of shaken baby syndrome; (2) Measles was a person having care, custody, or control over the victim in the offense; (3) Measles had recently violated the conditions of bond and was out on bond for a theft charge in LaPorte Superior Court 3 when she committed this offense; and (4) the victim of this offense was less than twelve years of age, in fact, was somewhere around three or four months of age. The trial court also found the fact that Measles accepted responsibility and pled guilty to be mitigating factors.

[16] In challenging her sentence, Measles claims that the trial court abused its discretion by finding both that (1) the crime was the result of shaken baby syndrome and (2) the victim was less than twelve years of age to be aggravating factors, arguing that these factors should have been merged together because the first factor encompasses the second. Measles also claims that the trial court abused its discretion by failing to find her lack of criminal history to be a mitigating factor.

## A. Aggravating Factors

[17] Measles argues that the trial court abused its discretion by finding both that (1) the crime was the result of shaken baby syndrome and (2) the victim was less than twelve years of age to be aggravating factors. Measles does not allege that either of these factors constituted an invalid aggravating factor, instead arguing

that these factors should have been merged together because the first factor encompasses the second. Measles has not cited to any authority in support of this argument. While the fact that a victim suffers from shaken baby syndrome logically indicates that the victim was under fourteen years old, we are unpersuaded by Measles's unsupported claim that both factors cannot be considered at sentencing to be aggravating factors to a crime.

[18] The Indiana Supreme Court has previously held that "even where the age of the victim is an element of the offense, the very young age of the child can support an enhanced sentence as a particularized circumstance of the crime." *Kimbrough v. State*, 979 N.E.2d 625, 628 (Ind. 2012) (citing *Buchanan v. State*, 767 N.E.2d 967, 971 (Ind. 2002)). In light of the Indiana Supreme Court's holding in *Kimbrough*, it seems nonsensical to us that a trial court could not consider both the nature of the offense, *i.e.*, that the victim suffered from shaken baby syndrome, and the very young age of the victim when sentencing a criminal defendant. Measles, therefore, has failed to convince us that the trial court abused its discretion in this regard.

## B. Mitigating Factors

[19] Although a sentencing court must consider all evidence of mitigating factors offered by a defendant, the finding of mitigating factors rests within the court's discretion. *Henderson v. State*, 769 N.E.2d 172, 179 (Ind. 2002). A trial court is neither required to find the presence of mitigating factors, *Fugate*, 608 N.E.2d at 1374 (citing *Graham v. State*, 535 N.E.2d 1152, 1155 (Ind. 1989)), nor obligated

to explain why it did not find a factor to be significantly mitigating. *Sherwood v. State*, 749 N.E.2d 36, 38 (Ind. 2001) (citing *Birdsong v. State*, 685 N.E.2d 42, 47 (Ind. 1997)). "A court does not err in failing to find mitigation when a mitigation claim is highly disputable in nature, weight, or significance." *Henderson*, 769 N.E.2d at 179 (internal quotations omitted). Furthermore, while Indiana law mandates that the trial judge not ignore facts in the record that would mitigate an offense, and a failure to find mitigating factors that are clearly supported by the record may imply that the trial court failed to properly consider them, *id.*, an allegation that the trial court failed to find a mitigating factor requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Carter v. State*, 711 N.E.2d 835, 838 (Ind. 1999).

### 1. Lack of Criminal History

Measles argues that the trial court should have found her relatively minimal criminal history to be a mitigating factor. Although a lack of criminal history may be considered to be a mitigating factor, trial courts are not required to give significant weight to a defendant's lack of criminal history. *Townsend v. State*, 860 N.E.2d 1268, 1272 (Ind. Ct. App. 2007), *trans. denied*. This is especially so "'when a defendant's record, while felony-free, is blemished.'" *Id.* (quoting *Stout v. State*, 834 N.E.2d 707, 712 (Ind. Ct. App. 2005), *trans. denied*).

While it is true that prior to the instant conviction, Measles did not have any criminal convictions on her criminal record, her record was not unblemished. As the trial court found, Measles had "recently violated the conditions of bond"

and "was out of bond for a theft charge in LaPorte Superior Court 3" at the time she committed the instant offense. Tr. Vol. II, p. 38. The trial court clearly considered Measles's other criminal behavior in sentencing her.

[22] Measles was eighteen years old when she committed the instant offense. At that young age, she committed the instant offense and was facing theft charges. As of sentencing, Measles had also demonstrated a lack of regard for the criminal justice system as is evidence by her violation of "conditions of bond." Tr. Vol. II, p. 38. As such, Measles's lack of criminal history was of disputable nature, weight, and significance. The trial court, therefore, did not abuse its discretion in failing to find Measles's lack of a criminal history to be a significant mitigating factor.

### 2. Additional Alleged Mitigating Factors

[23] We note that in her appellate brief, Measles also mentions the fact that the trial court did not find her claimed remorse and alleged mental health issues to be mitigating factors. However, she did not present a specific argument that the trial court abused its discretion in failing to find either of these factors to be mitigating. Measles only presents the specific argument that the trial court abused its discretion in failing to find her lack of criminal history to be a mitigating factor.

[24] However, to the extent that Measles can be said to be challenging the trial court's failure to find her claimed remorse to be a mitigating factor, the record demonstrates that such remorse is disputed. We have previously concluded

that "a trial court's determination of a defendant's remorse is similar to its determination of credibility: without evidence of some impermissible consideration by the trial court, we accept its decision." *Sandleben v. State*, 29 N.E.3d 126, 136 (Ind. Ct. App. 2015) (citing *Pickens v. State*, 767 N.E.2d 530, 535 (Ind. 2002)), *trans. denied*. Measles presents no evidence on appeal of any impermissible consideration by the trial court with regard to her claimed remorse. As such, we accept the trial court's apparent decision that Measles's claimed remorse did not amount to a significant mitigating factor. *See id*.

[25] Likewise, to the extent that Measles can be said to be challenging the trial court's failure to find her alleged mental illness to be a mitigating factor, Measles has failed to make the showing necessary to prove that alleged mental illness should be considered significant. In *Smith v. State*, 929 N.E.2d 255 (Ind. Ct. App. 2010), we explained that the question of whether alleged mental illness should be considered a significant mitigating factor depends on:

> 1) the extent of the defendant's inability to control his or her behavior due to the impairment; 2) overall limitations on functioning; 3) the duration of the mental illness; and 4) the extent of any nexus between the impairment and the commission of the crime.

929 N.E.2d at 259 (citing *Williams v. State*, 840 N.E.2d 433, 439 (Ind. Ct. App. 2006)). Measles presents no evidence or argument relating to the above-listed factors on appeal. As such, she has failed to establish that her claimed mental illness should have been given significant mitigating weight.

# II. Appropriateness of Sentence

[26] Measles also contends that her eleven-year executed sentence is inappropriate. In raising this contention, however, Measles concedes that the "circumstances surrounding this case are nothing short of tragic" and that the "injuries caused by the shaking were devastating." Appellant's Br. p. 12.

[27] Indiana Appellate Rule 7(B) provides that "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In analyzing such claims, we "'concentrate less on comparing the facts of [the case at issue] to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character.'" *Paul v. State*, 888 N.E.2d 818, 825 (Ind. Ct. App. 2008) (quoting *Brown v. State*, 760 N.E.2d 243, 247 (Ind. Ct. App. 2002), *trans. denied*). The defendant bears the burden of persuading us that his sentence is inappropriate. *Sanchez v. State*, 891 N.E.2d 174, 176 (Ind. Ct. App. 2008).

[28] With respect to the nature of Measles's offense, the record demonstrates that Measles shook B. with enough force to cause serious injury to B. As is detailed above, when B. was admitted to the hospital, he "was experiencing severe seizures and he was in a lifeless state." Tr. Vol. II, p. 5. His condition was determined to be the result of "the severe trauma that he had experienced to his head and the swelling that was going on at the time within the brain, and they

noticed brain damage when they brought him in as well, that he was almost to the point of death." Tr. Vol. II, p. 5. In addition, his condition was such that he had to be placed on life support and remained in the hospital for approximately ten days. After leaving the hospital B., required, and continues to require, around-the-clock care.

[29] In addition, as a result of the trauma inflicted by Measles, B. suffers numerous seizures daily and doctors believe that he will continue to suffer from seizures for the rest of his life. B. has suffered "irreversible" brain damage, which has caused "severe developmental delays." Tr. Vol. II, p. 8. B. is also "totally behind" on his developmental milestones. Tr. Vol. II, p. 9. Again,

> [B.'s] over a year old. He is not crawling yet. He is just now being able to get up on his arms, but he stiffens his hands. He doesn't open them up to try to crawl. They work with him in getting him up on his fours, but he doesn't -- he can't figure out what to do with them. As far as sitting goes -- like I said, he's over a year old. At this point he should be sitting on his own. He is not able to do that. If you try to sit him in a position, he, within a couple of seconds, will fall over if someone is not holding him or adjusting his back or something of that nature. As far as -- he is just now starting to babble a little bit, but otherwise he's basically behind on the whole scale; and also his growth has also been – he's on the low -- very low end of everything on his growth chart.

Tr. Vol. II, p. 9. As for B.'s head development, "he's only in the third percentile" and he is "within the 25th percentile or less in his other areas." Tr. Vol. II, p. 9.

B. suffered physical ailments to his neck and shoulders as a result of the trauma inflicted upon him. He has experienced a problem with his left eye. It is not yet known whether the issue with B.'s left eye has resulted in full or partial blindness. To say the least, Measles's heinous acts against B. have had a catastrophic and life-changing impact on her son.

As for her character, the fact that Measles is capable of inflicting the above-described injuries on her own son does not reflect favorably upon her character. Neither does the fact that, at least initially, she failed to demonstrate remorse for her actions. While Measles had suffered from anger control issues for much of her young life, even to the point of blacking out and demonstrating violent behavior, she failed to address these issues prior to committing the underlying offense. Further, while Measles has had only minimal contacts with the criminal justice system, she had "recently violated the conditions of bond" and "was out of bond for a theft charge in LaPorte Superior Court 3" at the time she committed the instant offense. Tr. Vol. II, p. 38. Upon review, we conclude that Measles has failed to prove that her sentence is inappropriate in light of the nature of her offense and her character.

## Conclusion

In sum, we conclude that (1) the trial court acted within its discretion in sentencing Measles and (2) Measles has failed to prove that her eleven-year sentence is inappropriate in light of the nature of her offense and her character.

[33] The judgment of the trial court is affirmed.

Robb, J., and Barnes, J., concur.