## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 31 2017, 8:45 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Timothy Smith,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

January 31, 2017

Court of Appeals Case No.
49A02-1605-CR-1156

Appeal from the Marion Superior Court

The Honorable Lisa F. Borges, Judge

Trial Court Cause No.
49G04-1506-F1-22228

**Bradford, Judge.**

# Case Summary

[1]     On numerous occasions between October of 2010 and June of 2015, Appellant-Defendant Timothy Smith sexually molested his two minor step-daughters. Smith was subsequently charged with and convicted of numerous counts of felony child molesting and felony criminal confinement. Smith was thereafter sentenced to an aggregate term of eighty-four years.

[2]     On appeal, Smith contends that the trial court abused its discretion in excluding certain proffered evidence from trial. Smith also contends, and the State concedes, that the evidence is insufficient to sustain one of his convictions. Smith further contends that his aggregate eighty-four-year sentence is inappropriate. Upon review, we conclude that (1) the trial court did not abuse its discretion in excluding certain proffered evidence from trial, (2) the evidence is insufficient to sustain the challenged conviction, and (3) Smith's aggregate eighty-four-year sentence is not inappropriate. Consequently, we affirm in part and reverse in part.

# Facts and Procedural History

[3]     Shemika Smith is the mother of four children, including K.J., who was born on December 28, 2000, and M.K., who was born on October 5, 2005. Shemika married Smith on June 18, 2011. From 2011 to 2015, Shemika and her children lived with Smith. During this time, Shemika worked long hours, including some twelve- or thirteen-hour days and weekends, as a training

coordinator at AAR Aircraft Services. Often, Smith would watch K.J. and M.K. after school until Shemika returned home from work.

[4] At the time of Shemika's and Smith's marriage, Shemika, Smith, and Shemika's children lived in an apartment in the Mayfield Green Apartments in Indianapolis. On one occasion, then-eleven-year-old K.J. walked past her mother's and Smith's bedroom on her way to her room after she finished taking a shower. At the time, K.J. was wrapped only in a towel. As K.J. walked by, Smith, who was in his and Shemika's bedroom, ordered K.J. into the bedroom. Smith "gave [K.J.] a whooping" with a leather belt and ordered her to lie on the bed. Tr. p. 79. Smith then disrobed and lay on top of K.J. Smith fondled K.J.'s breasts and put his penis partly in her vagina, causing her pain. After hearing K.J.'s brothers enter the residence, Smith ejaculated "on [K.J.'s] vagina" before rising off of K.J. Tr. p. 86. After the incident ended, K.J. began crying. She decided to take another shower because she "felt disgusted." Tr. p. 85. Smith subjected K.J. to similar sexual abuse "[m]ore than once" while the family lived in the Mayfield Green Apartments. Tr. p. 87. K.J. did not report Smith's actions because she "was scared." Tr. p. 86.

[5] From October of 2011 through part of 2012, Shemika, Smith, and Shemika's children lived in a residence on Dunsany Court in Indianapolis. On one occasion while the family lived in the residence on Dunsany Court, K.J. awoke to find Smith touching her. Smith removed K.J.'s tank top, removed her pants and underwear, and ordered her to lie on her stomach. Smith pushed her legs open, lay on top of K.J., and "took his penis and tried to put it in" K.J.'s anus.

Tr. p. 88. After Smith stopped, he got up, gave her money and food, and called her a "ho." Tr. p. 93. Similar sexual abuse occurred "[m]ore than once" while the family lived in the residence on Dunsany Court. Tr. p. 93. On one of these other occasions, K.J. believed that one of her older brothers "basically" saw the abuse. Tr. p. 93. K.J. reported the abuse to her mother, but when questioned by Shemika about what he observed, K.J.'s brother indicated that he "didn't see anything." Tr. p. 94.

[6] From the remaining part of 2012 through September of 2013, Shemika, Smith, and Shemika's children lived in a residence on West 38th Street in Indianapolis. On one occasion while the family lived in the residence on West 38th Street, K.J. was cleaning the basement when Smith came downstairs, "bent [K.J.] over the dryer[,] and pulled [her] pants down." Tr. p. 95. Smith spread K.J.'s legs, placed his hands on her back, and "tried to put his penis in [her] vagina." Tr. p. 96. K.J. indicated that "it hurt worse than all the other times" and felt like "he was really trying to force it in [her] vagina." Tr. p. 96. K.J. indicated that on this occasion, Smith also "tried to put it in her butt." Tr. p. 97. This incident of sexual abuse ended when Smith heard Shemika enter the residence. Similar sexual abuse occurred "[m]ore than once" while the family lived in the residence on West 38th Street. Tr. p. 98.

[7] M.K. also indicated that on one occasion while the family lived in the residence on West 38th Street, Smith "pushed" her down on her bed, took her clothes off, and "started having sex with [her]" by placing his penis between her buttocks and "moving up and down and side to side." Tr. p. 38. M.K. was eight years

old at the time. She indicated that similar sexual abused occurred "[m]ore than once" while the family lived in the residence on West 38th Street. Tr. p. 40.

[8]     From September of 2013 through June of 2015, Shemika, Smith, and Shemika's children lived in a different residence on Dunsany Court in Indianapolis. K.J. "basically locked [herself] in [her] room, or like if [Smith] was there … would probably go outside and wait until [her] mom got home." Tr. p. 100. Smith, however, continued to molest M.K. during this time. On one occasion in March of 2015, Smith "forced [M.K.] to get on the bed and take [her] clothes off." Tr. p. 28. Smith, who was not wearing any clothes, lay down on M.K.'s back. M.K. could feel Smith's "penis and his stomach" on her back. Tr. p. 30. Smith rubbed his penis between M.K.'s buttocks. During this time, Smith was moving "[u]p and down and side to side." Tr. p. 32. M.K. indicated that this contact with Smith felt "scary" and "wrong." Tr. p. 32. Smith ignored M.K.'s requests to stop and he continued until he ejaculated. Similar sexual abuse occurred "[m]ore than once" while the family lived in the residence on Dunsany Court. Tr. p. 36.

[9]     Smith told M.K. that he would kill her family if she told anyone about the abuse. Despite these threats, M.K. told a friend and her mother about Smith's actions. M.K. indicated, however, that her mother didn't believe her the first time she reported Smith's abuse, so she did not report any other incidents.

[10]    In June of 2015, K.J., M.K., and their cousin went to Six Flags in St. Louis with Shemika and Smith. During the trip to St. Louis, Smith took M.K. and

her cousin to the swimming pool. While at the swimming pool, M.K. noticed that Smith was looking at her in a "funny" and "creepy" way. Tr. p. 41.

[11] When the family returned to Indianapolis, M.K.'s uncle came to the family's residence to pick up M.K.'s cousin. M.K. was "tired of the things [Smith] kept doing to [her]" and was "forcing [her] to do," so she decided to report the sexual abuse to her uncle. Tr. pp. 40, 41. M.K. got in the car with her uncle, who drove around the corner while they talked. M.K. then told her uncle that Smith "kept doing nasty stuff" to her. Tr. p. 42. M.K.'s uncle "reacted in a mad way" and, while M.K. was still in the car, "called the police" and reported the abuse. Tr. p. 42.

[12] The police responded to the location where M.K. and her uncle were parked and began to investigate the reported sexual abuse. During the course of this investigation, K.J. also informed the police that Smith had committed sexual abuse on her. Soon thereafter, on June 25, 2016, Appellee-Plaintiff the State of Indiana ("the State") charged Smith as follows: Count I – Class A felony child molesting, Count II – Class C felony child molesting, Count III – Class C felony criminal confinement, Count IV – Class A felony child molesting, Count V – Level 1 felony child molesting, Count VI – Class A felony child molesting, Count VII – Level 4 felony child molesting, Count VIII – Level 5 felony criminal confinement, and Count IX – Class D felony performing sexual conduct in the presence of a minor.

[13]     The trial court conducted a jury trial on April 4, 2016.  At the conclusion of the presentation of evidence, Smith requested a directed verdict on Count IX.  The State conceded that the witness testimony did not prove the allegations set forth in Count IX.  Finding that the evidence did not support the charges alleged in Count IX, the trial court granted Smith's motion for a directed verdict on that count.  The jury subsequently found Smith not guilty of Count I and guilty of Counts II through VIII.

[14]     At sentencing, the trial court merged the convictions in Counts III and VIII into Counts II and VII, respectively.  The trial court sentenced Smith as follows: Count II – four years executed, Count IV – forty years executed, Count V – thirty years executed, Count VI – thirty years executed, and Count VII – ten years executed.  The trial court ordered that the sentences would run consecutively, except for the sentence imposed for Count V which would run concurrently to the sentence imposed in Count IV, for an aggregate executed term of eighty-four years.  This appeal follows.

# Discussion and Decision

## I.  Exclusion of Evidence

[15]     Smith contends that the trial court abused its discretion by prohibiting the defense from presenting evidence to show that K.J. had made prior false accusations of sexual misconduct.  For its part, the State argues that the trial court did not abuse its discretion in this regard.

# A. Waiver

The State argues that Smith waived his contention regarding the admission of the evidence because he failed to provide pre-trial notice of the evidence as is required by Indiana's Rape Shield Rule, which is set forth in Indiana Evidence Rule 412. With respect to questions concerning the admissibility of evidence relating to alleged prior false accusations of rape and Indiana's Rape Shield Rule, the Indiana Supreme Court has held as follows:

> Rule 412 is designed only to preclude evidence of a complaining witness's prior sexual conduct. Evidence of prior false accusations of rape made by a complaining witness does not constitute "prior sexual conduct" for rape shield purposes. In presenting such evidence, the defendant is not probing the complaining witness's sexual history. Rather, the defendant seeks to prove for impeachment purposes that the complaining witness has previously made false accusations of rape. Viewed in this light, such evidence is more properly understood as verbal conduct, not sexual conduct. *Little v. State*, 413 N.E.2d 639, 643 (Ind. Ct. App. 1980); *Hall v. State*, 176 Ind. App. 59, 374 N.E.2d 62, 65 (1978). To the extent a defendant offers evidence of prior false accusations of rape to impeach the credibility of the witness, we hold that its admission does not run afoul of the Rape Shield Rule.

*State v. Walton*, 715 N.E.2d 824, 826-27 (Ind. 1999) (footnotes omitted).[1] As such, we conclude that Smith's failure to follow the procedural requirements of

---

[1] The Indiana Supreme Court noted, however, "that prior true accusations of rape do constitute evidence of the complaining witness's prior sexual history. Consequently, such

Evidence Rule 412(c) does not, in and of itself, preclude him from attempting to impeach K.J.'s credibility by presenting evidence that she had made prior false accusations of rape.

## B. The Merits

[17] We next turn our attention to the question of whether the trial court abused its discretion by prohibiting the defense from presenting evidence to show that K.J. had made prior false accusations of sexual misconduct. In reviewing this question, we address whether the evidentiary foundation for the introduction of evidence of prior false accusations of rape has been satisfied in this case. *See id*. at 827.

[18] The Indiana Supreme Court has held that evidence of prior false accusations of rape may be admitted if (1) the complaining witness admits he or she made a prior false accusation of rape or (2) the accusation is demonstrably false. *Id*. In the instant matter, K.J. has not admitted to making any false accusations, rendering the first exception set forth above inapplicable. As such, in order for the trial court to have abused its discretion by excluding the evidence at issue, the prior accusations which were allegedly made by K.J. must be "demonstrably false." *See id*. at 828.

> When a trial court has made a ruling concerning the sufficiency
> of the foundation laid to justify the admission of evidence, we

evidence is inadmissible under the Rape Shield Rule." *Walton*, 715 N.E.2d at 827 n.7 (citing *Little*, 413 N.E.2d at 643).

review that decision for an abuse of discretion. *Mullins v. State*, 646 N.E.2d 40, 51 (Ind. 1995). "Because the predicates or foundational requirements to admissibility often require factual determinations by the trial court, these findings are entitled to the same deference on appeal as any other factual finding, whether that is described as a clearly erroneous or abuse of discretion standard." *Stahl v. State*, 686 N.E.2d 89, 91 (Ind. 1997).

*Id.*

In the instant matter, the trial court conducted a hearing outside the presence of the jury during which defense counsel attempted to make an offer to prove that K.J. had made prior accusations of sexual abuse and that these prior accusations were demonstrably false. During the lengthy hearing, the following exchange occurred between defense counsel, the State, K.J. and the trial court:

> [The Defense]:     [K.J.], … I want to ask you about some things in the past that don't necessarily revolve around this case.… Is it, is it true in the past that you've, um, alleged … people other than Mr. Smith have touched you inappropriately?
>
> [The Witness]:     No.
>
> [The Defense]:     You never accused your brother [E.J.]?
>
> [The Witness]:     No.
>
> [The Defense]:     You never accused a man in the park?
>
> [The Witness]:     No.
>
> [The Defense]:     Okay. Um. When you were younger, was there a DCS case where you accused separately than this case, um, [Smith] of touching you inappropriately?
>
> [The Witness]:     No.

[The Defense]: So, it's not true – well, isn't it true that there were several reports even generated, um, regarding allegations you made of improper sexual conduct in the past?

[The Witness]: To who? From who?

[The Defense]: From you?

[The Witness]: About what?

[The Defense]: Isn't it true that you reported to your mother that somebody had sexually assaulted you in the park one time?

[The Witness]: No.

**\*\*\*\***

[The Defense]: I want to ask about a sexually transmitted disease [("STD")].

[The State]: How is that relevant, Judge?

**\*\*\*\***

[The Court]: With regard to the STD, what do we know about, what's the facts?

[The State]: She had an STD at some point. That's when she alleged that [Smith] had touched her. She at some point said there was somebody maybe at a park, she was never specific about that, and that was the end of that.

[The Court]: So, what I'm trying to understand is, I still don't know enough about it. I mean, I've never, I don't think I've seen the reports.

[The State]: No.

**\*\*\*\***

[The State]: There's never anything between an STD and [Smith] and what she said about the park. So they're throwing a lot of things at her. How can she decipher that?

[The Court]: That kind of helps me, because is it links to the (inaudible).

[The State]: No.

[The Defense]: Yes.

[The Defense]: Yes. She accused (inaudible) another man.

[The State]: There was no link. I mean, nothing came out in the test. There was [sic] no results. There were [sic] no paperwork from that test.

[The Court]: Here's the question. Did she - how did we find out she had an STD?

[The State]: Her mom found out when she was close to her mom. I think they went to a doctor and they were told that she had chlamydia and then her mom decided later on to have everybody from the household get tested. However, [Smith] never showed mom like results from a test, reports or anything, just said something along the lines of I called and they told me I didn't have it. And that was the end of that.

[The Court]: He was never tested, do we know?

[The State]: Exactly that we know of. Exactly. All we have is his word.

[The Court]: Once there's this report, the doctor finds her with chlamydia and he asks everybody in the family to be tested, right, what does she say about where any such contact —

[The State]: [Smith].

[The Court]: — might have been responsible for it?

[The State]:        [Smith].

[The Court]:        Where's this man in the park?

[The State]:        At some point, she mentions something about the park, but she never gave her mom a name or anything like that.  And the way I read that —

[The Court]:        Details of that.  Can I see it?

[The State]:        Is that the report you're using?

[The Defense]:      (Inaudible) get copies made and then (inaudible).

****

[The Court]:        Sure.  Okay.  Is this the whole report?

[The State]:        I believe so, yes.

[The Defense]:      I believe so, too.

[The Court]:        Okay.  So, how do we know, I mean, what else do we know about this.  Because you're saying that she later said it wasn't a man in a park it was instead —

[The State]:        Right.  And that's from her later when she was forensically interviewed for this case, they asked her specifically about that report.  And in there, she says it was always [Smith].

[The Court]:        This is — it is and it isn't.  It becomes admissible if she's seen it and it wasn't true, it was really [Smith].  Then that's admissible.  If on the other hand, she said it and it was true that it was someone else, it is not admissible.

[The State]:        Here's my problem with it.  It was never truly clarified.  She never had conversations with her mom about it, so mom doesn't know.  The only thing that I have to go by other than what I ask her and she again can't distinguish anything, in

the forensic interview, she is specifically asked, "Do you remember being in a room like this before?" and she says, "Yeah, I think so." And they ask her about specifics of that case, and she can't deny or admit anything, then she just goes and starts talking about [Smith]. So there is the problem that she was, there was no further investigation in that.

[The Court]:     This report is made in November of 2010. He wasn't even in the house.

[The State]:     They were dating before. They were dating before. They got married in 2011.

[The Court]:     When they were dating, was he living with her?

[The State]:     I don't know.

[The Court]:     Where is it in the interviews that she's asked about this?

[The State]:     I can get the transcript.

**\*\*\*\***

[The State]:     It was never really clarified. That's the thing is she never came out and said it was a man in a park or it was [Smith]. They just —

[The Court]:     That's why I need — it matters to me what she actually said.

**\*\*\*\***

[The State]:     Right. Okay. I think it might start there or might start the page before that.

[The Court]:     I don't see anything in here about the park.

[The State]:     Right. And that's the thing. I don't know if she just doesn't remember, or she's confused. That's the extent

that they go into being in that room before. And that's the only other time she was in that room, but they just don't talk about anything further, and that's what she tells me.

[The Court]: Who tells you?

[The State]: [K.J.]. I mean, she just doesn't — it seems like she just can't remember that time in the park. She doesn't deny it or admit it or talk about it. So we just don't know if it was him or it was a man in a park or it was somebody else.

[The Court]: Well, earlier you said that she had been asked about it in this interview and she said the man in the park was [Smith].

[The State]: She said the prior time they talked about it was [Smith].

[The Court]: Oh. She told you that —

[The State]: She was asked —

[The Court]: — but she never said that in here?

[The State]: Right.

[The Court]: Okay. I wish we had done this before trial. This is the kind of thing that takes time.

[The State]: Yeah. I [sic] afraid, Judge, it's going to open this door to something that was murky to begin with and it was never fully investigated the way it should have been, and so I —

[The Court]: (Inaudible).

[The State]: —don't know if she remembers or not.

[The Court]: If it was or it wasn't. I don't know what happened. I don't know what she said, and apparently all we know is she was in a room with pictures. You know, and we don't know when in time that that was. This report was made in

November, 2010, which makes me think that it had to have happened — I mean, I'm trying to understand how it got to [the Department of Child Protective Services ("CPS")].

[The Defense]:    In that report it says she came home, reported to her mother that some man assaulted her.  Her mother waited a day because she said she had made prior false allegations, so she waited a day for her to get a sexual exam.  Then there was proof of a positive test so then they followed up and investigated.  Her mom says she went through a whole course of questioning, so it sounds like it was actually investigated.

[The Court]:    So, I mean, where does it say she was tested after this interview?

[The Defense]:    No.  I think the testing leads to that.

[The Defense]:    That's what prompted the report.

[The Court]:    Because this is what the mother says.  This is what the child said.  Also, it also says here "no disclosure."

[The Defense]:    Right.  That's because she admitted and said she made it all up.

[The Court]:    It says "no disclosure."  It doesn't say anywhere she made it all up.  It says — where do you have something that has that?

[The Defense]:    (Inaudible) when they interviewed her. (Inaudible) when through the whole process of being interviewed before she admitted that she lied and made that up.

[The State]:    R.S. said that but not [K.J.].

[The Court]:    Who is R.S.?

[The State]:    I don't know.  (Inaudible).  She's trying to figure out who it was.  I don't know.  But it doesn't say [K.J.] ever lied.

[The Defense]:     We're not privy to, we don't have the interviews.

[The Court]:     *First, I'm not going to allow it. It is so, it is so vague, um, and in there it, it appears to be a hearsay statement by some person about what someone said.* And then when I look further into the report, it says "zero disclosure" and then there is, then there is a part — let me have it back. This part down here, there is a touch and fondle that is, that is alleged, but we don't know the result of this. *I don't have anything that I can point to that says this is true or not true other than the hearsay statement that's in this. And so for that reason, I think you've made an offer. But I don't see enough concrete information for me to be able to rule it admissible. I don't have anything that shows it demonstrably false.* Um. And here, here comes the other issue. This — how do you, how do you then impeach her with it if she says no? You see what I mean? Because in order to do that, you almost have to have a witness to come in to say that she did say that. And I don't know who that is. I don't know who R.S. is.

[The Defense]:     Well, I think her mother is responding to the complaint against —

[The State]:     You think that, but you don't know that.

[The Defense]:     (Inaudible) testifies and we have her available to.

[The Court]:     I'm just saying I don't, I don't find enough information that indicates that she said — I've actually forgotten the phraseology that you used.

[The Defense]:     Since there's been references made to it, we should probably make that part of an exhibit for purposes of the offer to prove, and so we'll do that. Um. I did make copies, but it was only the two pages. You've referred to several more. I'll make copies of that and make our, our A. That makes sense to me.

**\*\*\*\***

[The Court]: Okay.… *[M]y ruling stands about it being inadmissible at this point, all right?  Unless something comes more clear to show me that she actually said that she lied.*

[The State]: Thank you, Judge.

**\*\*\*\***

[The Defense]: Judge, in terms of the offer to prove, I am going to make copies of the exhibit that the Court reviewed and reference has been made to in the Court's ruling.  I appreciate the wording becomes important.  And so we'll make that part of the record.  And I suppose, in terms of offer to prove, um, I suppose our intent is really what we need to get on the record.  We would like to be able to ask about the circumstances of this previous stuff.  The Court has reviewed what we'd like to get into and you find that it's not tied in close enough that would allow it.  Um.  We would like to be able to ask, ask about evidence regarding, um, a sexually transmitted disease.  There was some association made to our client.  We would offer, we could offer testimony that would challenge whether our client ever had one through either our client or his wife, the child's mother.  Um.  Again, I think the Court has considered that, but those are things that we would have liked to have done.  We appreciate the Court's ruling, but we want to make sure the Court was clear on where we wanted to go.

[The Court]: My understanding is that the — at this point, what, there's, there's no connection made by the child to the defendant with regard to any prior report that may have been made.  Um.  *That report details hearsay, um, and that hearsay, I don't know who the person is that's saying that.  It's detailed as "R.S."  I don't know who that is, but that is the interpretation that person is putting on what they understood a situation to have been, which because it's hearsay, in my mind is not enough for me to allow it.*  With regard to sexually transmitted disease, I also can't find any — nobody is

giving me a statement where somebody says she said that he gave her chlamydia or that her chlamydia came from contact with the defendant.

[The State]:         No such statement exists.

[The Court]:         Okay.  So, given those, that situation, I think the defense did want to rephrase some of their questions, and I'm going to allow that, so if you want to retrieve your witness.

[The State]:         Thank you, Judge.

****

[The Court]:         Okay.  You're still under oath, all right?  You still have to tell the truth, and I think that [defense counsel] has a few more questions for you.  All right.  So, try to speak up so I can really hear you and understand what you're saying.  Okay?

[The Witness]:       Okay.

****

[The Defense]:       [K.J.], did you ever tell your mother that someone touched you in a park?

[The Witness]:       No.

[The Defense]:       Did you ever tell your mother there was inappropriate contact between you and another family member besides [Smith]?

[The Witness]:       No.

[The Defense]:       Are you sure?

[The Witness]:       Can you repeat that?

[The Defense]:       In 2010, did you ever tell your mother that

[Smith] touched you inappropriately?

[The Witness]:      Did I tell anybody else?

[The Defense]:      Did you tell anybody that?

[The Court]:      Do you know what he means by "touched you inappropriately?"

[The Witness]:       Mm—hm. I just don't understand the question.

[The Defense]:      In 2010, the year 2010, at that time did you tell anyone that [Smith] had molested you?

[The Witness]:      I didn't know [Smith] in 2010.

[The Defense]:      Okay. Do you ever remember being interviewed around 2010 similar to how you were in this case?

[The Witness]:      No.

[The Defense]:      Okay.  Um.  And do you ever remember contracting a sexually transmitted disease around 2010?[2]

[The Witness]:      Yeah.  From [Smith].

[The Defense]:      From [Smith]?

[The Witness]:      Yes.

[The Defense]:      Okay. Did you tell anyone that he was the

---

[2] The record is not clear exactly when K.J. allegedly contracted the STD.  Thus, this statement is not inconsistent with her prior testimony as it is possible that she contracted it at some point "around" 2010, such as 2011.

source of that?

[The Witness]: My mom took me but the doctor said it wasn't contagious or anything.

[The Defense]: Okay. Did you tell anyone else about that?

[The Witness]: No.

[The Defense]: All right.

[The Defense]: Judge, can I have just a moment?

[The Court]: Sure. Did you ever have to be interviewed by, uh, in a room where they had pictures of like a boy and a girl without clothes on?

[The Witness]: Yes.

[The Court]: Okay. When did that happen, if you remember?

[The Witness]: That was when [Smith] had told CPS that my brother touched me inappropriately.

[The Court]: So, the defendant told CPS your brother had touched you?

[The Witness]: Yes.

[The Court]: Is there a reason he would tell that?

[The Witness]: No. Him and my brother never really liked each other.

[The Court]: Okay. So, did you, were you asked about that?

[The Witness]:      Yes.

[The Court]:      And what did you say?

[The Witness]:      I said no.

[The Court]:      You said that your brother did not do that? Okay.  Was there a time ever when you were asked about being in a park and someone touching you under your bra?

[The Witness]:      No.

[The Court]:      You don't remember that?

[The Witness]:      No.

[The Court]:      Okay.  Were you ever, um, talking to CPS anytime other than about [Smith]?

[The Witness]:      No.  Except for that they told me that he told that my brother inappropriate [sic] touched me.

[The Court]:      Okay.

Tr. pp. 109-30 (emphases added).

[20]   Defense counsel introduced the CPS report that was discussed during the above-quoted exchange.  This report, which was not certified, was allegedly created on November 3, 2010.  The report was prepared by an individual named Deanna D. Burns and states, in relevant part, as follows:

    RS states [K.J.] reported last night … to her mother that she was touched inappropriately by a strange man while at the park

yesterday. RS states [K.J.] said she was touched and rubbed on the leg by the man. RS states [K.J.] was asked if anything else happened and she said no. RS states [K.J.] later said that he "put it in her butt." RS states the mother did not ask for clarification of what the strange man put in her butt.… RS states that mother stated that [K.J.] has a history of making allegations that she had been sexually perped on before by her eldest brother. RS states [K.J.] went through the whole process of being interviewed before she admitted that she lied and made the whole thing up. RS states the mother said this was about two years ago. RS states the mother said this is why she waited until this morning before bringing [K.J.] to the hospital. RS states [K.J.] told a doctor that the guy was at the park and that she went to a home with the guy and her friend. RS states the family just moved into the home October 1st. RS states [K.J.] hasn't really had time to make friends and she could not give the friend's name. RS states the mother stated that [K.J.] had not mentioned anything about going to anyone's house before.

Defendant's Ex. A. Burns, a CPS case manager, indicated that the report was "recommended for assessment." Defendant's Ex. A. The report further indicated that the CPS decision was to "Investigate." Defendant's Ex. A. The report contained no indication of who "RS" was.

[21] Upon review, we concur with the trial court's assessment that Defendant's Exhibit A contained vague, hearsay information from an unknown source which could not be relied upon to prove that K.J. had made prior false claims of sexual molestation. To the contrary, the report indicates that although RS indicated that K.J. had made previous false statements, CPS decided to further investigate the matter. Defense counsel did not attempt to introduce any information relating to the outcome of CPS's investigation.

[22] K.J. consistently testified that she had not made prior false accusations of sexual molestation and the defense failed to meet its burden of proving that any alleged prior accusations were "demonstratively false." As such, we conclude that the trial court did not abuse its discretion by prohibiting the defense from presenting evidence which the defense claimed would show that K.J. had made prior false accusations of sexual misconduct.

## II. Sufficiency of the Evidence

[23] Smith also contends that the evidence is insufficient to sustain his conviction for Level 1 child molesting as was alleged in Count V.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations omitted). "In essence, we assess only whether the verdict could be reached based on reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in

original). Upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002).

[24] Count V alleges that he committed the offense of Level 1 felony child molesting by performing or submitting to sexual conduct with K.J. at some point between July 1, 2014 and December 27, 2014. In challenging his conviction for Level 1 felony child molesting, Smith argues, and the State concedes, that there is no evidence in the record that any sexual conduct occurred between K.J. and Smith within the charged time frame. The State further concedes that Smith's conviction for Level 1 felony child molesting as charged in Count V should be vacated.

[25] We must agree that given the complete lack of any evidence suggesting that Smith committed acts upon or submitted to acts by K.J. during the time frame charged in Count V, Smith's conviction under Count V and the corresponding thirty-year sentence must be vacated. We conclude, however, that, as the State correctly notes, because the thirty-year sentence imposed in relation to Count V was ordered to run concurrently to the forty-year sentence imposed in relation to the unchallenged Count IV, vacating Smith's conviction and sentence in Count V does not alter Smith's overall sentence.

# III. Appropriateness of Sentence

[26] Smith last contends that his aggregate eighty-four-year sentence is inappropriate.[3] In challenging the appropriateness of his sentence, Smith asserts that while it "cannot be said that these were not grievous offenses or that [his] character is flawless," "the offenses, despite their grievousness, and his character, despite its flaws, do not justify the harsh sentence imposed here." Appellant's Br. p. 21. We disagree.

[27] Indiana Appellate Rule 7(B) provides that "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In analyzing such claims, we "'concentrate less on comparing the facts of [the case at issue] to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character.'" *Paul v. State*, 888 N.E.2d 818, 825 (Ind. Ct. App. 2008) (quoting *Brown v. State*, 760 N.E.2d 243, 247 (Ind. Ct. App. 2002), *trans. denied*). The defendant bears the burden of persuading us that his sentence is inappropriate. *Sanchez v. State*, 891 N.E.2d 174, 176 (Ind. Ct. App. 2008).

---

[3] We again note that our conclusion that Smith's conviction and sentence under Count V should be vacated does not affect his overall aggregate sentence as it was ordered to run concurrently to the sentence imposed for his unchallenged conviction under Count IV.

[28] With respect to the nature of Smith's offenses, the record demonstrates that Smith violated a position of trust by repeatedly molesting his two young step-daughters. K.J. was eleven years old and M.K. was eight years old, respectively, when Smith began molesting the girls. Following the conclusion of one instance of misconduct, Smith gave K.J. "some money and some food" and called her a "ho." Tr. pp. 92, 93. Smith also threatened M.K. that he would kill her family if she told anyone about the molestation. In its oral sentencing statement, the trial court detailed the severe negative impact suffered by the girls as a result of Smith's actions. Given the circumstances surrounding Smith's actions, we believe that the State accurately describes said actions as the "ruthless exploitation" of his step-daughters' "vulnerability." Appellee's App. p. 38.

[29] With respect to Smith's character, the record demonstrates that Smith has an extensive criminal history. This criminal history includes juvenile adjudications for what would have been Class D felony theft and Class B misdemeanor disorderly conduct if committed by an adult. Smith's criminal history also includes the following convictions: two counts of Class C felony battery, two counts of Class C felony carrying a handgun without a license, Class D felony theft, Class D felony possession of cocaine, Class D felony dealing in marijuana, Class D felony resisting law enforcement, two counts of Class A misdemeanor battery, Class A misdemeanor carrying a handgun without a license, Class A misdemeanor resisting law enforcement, and two counts of Class A misdemeanor driving while license suspended with a prior conviction.

Smith has also violated the terms of his probation on at least one occasion. Further, between June of 1995 and January of 2008, Smith was cited for fifty-four "prison conduct incidents." Appellant's App. Vol. III, p. 10. These citations indicated that Smith's prison misconduct included, but was not limited to, incidents involving sexual conduct, battery, sexual assault, and being a habitual conduct rule violator.

[30] The fact that Smith has provided assistance to his mother and maintained some contact with and supported his own children, does not alter the fact that Smith has also proven to be a violent individual who has a propensity to commit violent acts upon others. A number of his prior convictions resulted from gun violence. In the instant matter, Smith violated a position of trust by repeatedly molesting his two young step-daughters. His substantial criminal history indicates that Smith has not only contempt for the criminal justice system, but also contempt for the rights and safety of others. Moreover, the Marion County Probation Department indicated that a risk assessment of Smith placed him "in the HIGH category to re-offend." Appellant's App. Vol. III, p. 16. As such, we conclude that Smith has failed to prove that his sentence is inappropriate in light of the nature of his offenses and his character.

## Conclusion

[31] In sum, we conclude that (1) the trial court did not abuse its discretion in excluding certain proffered evidence from trial, (2) Count V must be vacated as it was not supported by sufficient evidence, and (3) Smith's aggregate eighty-

four-year sentence is not inappropriate in light of the nature of his offenses and his character.

[32] The judgment of the trial court is affirmed in part and reversed in part.

Vaidik, C.J., and Brown, J., concur.