## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 04 2019, 6:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Sean C. Mullins
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Eric Lee Yost,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 4, 2019

Court of Appeals Case No.
18A-CR-2151

Appeal from the Lake Superior Court

The Honorable Diane Ross Boswell, Judge

Trial Court Cause No.
45G03-1408-FB-54

**Bailey, Judge.**

# Case Summary

Eric Raymond Yost ("Yost") challenges his conviction of aggravated battery, a Class B felony,[1] and his sentence.

We affirm.

# Issues

Yost raises five issues which we consolidate and restate as:

I.      Whether the State provided sufficient evidence to support his conviction of aggravated battery.

II.     Whether the trial court abused its discretion when it denied Yost's request to give a "reasonable theory of innocence" jury instruction.

III.    Whether the trial court abused its discretion in sentencing.

IV.    Whether Yost's sentence is inappropriate in light of the nature of the offense and his character.

# Facts and Procedural History

On the evening of December 12, 2013, Yost and Jacob Oxley ("Oxley") both attended a Local 150 Union meeting at a union hall in Merrillville. During the

---

[1] Ind. Code § 35-42-2-1.5 (2014).

approximately two-hour meeting, some attendees went to the front of the building to socialize and drink alcohol. After the meeting, many attendees— including Yost and Oxley—stayed at the union hall to meet local business representatives, socialize, and drink beer and moonshine. Yost did not know Oxley but, when Yost observed Oxley drinking from a mason jar after the meeting, Yost asked Oxley what was in the mason jar. Oxley handed Yost the mason jar and, while Yost was smelling the contents of the container, Oxley "popped" the container "into [Yost's] face," causing the contents to spill slightly. Tr. Vol. VI at 41-42; 169-70. Oxley and Yost exchanged angry words and then separated.

[5] Oxley and some of his coworkers then left the main hall of the building to meet with a local business representative, Michael Simms ("Simms"), in another part of the building. Oxley left the meeting with Simms before it was over and waited for his friends in the foyer of the building. While Oxley waited, Yost entered the foyer and began arguing with Oxley. Yost then used his right hand to strike Oxley in the face, and Oxley's head went backwards toward the brick wall behind him. Yost punched Oxley again, this time with his left fist, and Oxley fell down and "out the [front] door." Tr. Vol. 6 at 184. Yost went outside and kicked Oxley in the leg before retreating back inside the foyer. Oxley returned to the foyer and attempted to kick Yost. Oxley lunged toward Yost, and Yost threw Oxley to the ground and kicked him. David Naillieux ("Naillieux"), a friend of Yost's who had witnessed the altercation, came into the foyer, got between the two men, and told Yost, "that's enough" and "let's

leave." Tr. Vol. 6 at 53. Yost, Naillieux, and two of Yost's other friends then left the building together.

[6] After the altercation with Yost, Oxley's friends Jason Gumulauski ("Gumulauski"), Scott Tully ("Tully"), and Simms joined him in the main hall of the building. Gumulauski noticed a red, swollen "knot" about the "[s]ize of a half dollar" on Oxley's forehead. Tr. Vol. III at 188. Simms noticed a large "abrasion on [Oxley's] forehead" that looked like "a rug burn." *Id*. at 235. Tully noticed Oxley's "face seemed swollen" and it "seemed like [Oxley] had abrasions" as well. Tr. Vol. IV at 35.

[7] Gumulauski drove Oxley back to his vehicle at a nearby restaurant. Oxley then drove himself home. Once home, Oxley informed his fiancé, Jessica Renfrow ("Renfrow"), that he had been in a fight at the union hall and had been "kicked in the head." Tr. Vol. II at 133-34. Renfrow saw that Oxley had a mark on his cheek, a "thumb-sized" abrasion on his forehead, and a knot "not quite golf ball size[d]," on the bottom back of his head. *Id*. at 111, 138-39. Oxley made himself something to eat and then went to bed.

[8] The next morning, December 13, at 4:30, Oxley awoke, took two Tylenol pills for a headache, and drove to the steel company where he worked. That morning during work two of Oxley's co-workers attempted to call him over the radio several times, but Oxley did not respond. When his co-workers approached the loader which Oxley was supposed to be operating, they observed that he was slumped over in his chair and unresponsive. Oxley's

coworkers called for medical assistance, and paramedics responded and transported Oxley to the hospital where he was pronounced dead. On the following day, Dr. Young M. Kim ("Dr. Kim") performed an autopsy on Oxley and prepared an autopsy report.

[9] On August 8, 2014, the State charged Yost with aggravated battery, a Class B felony, battery resulting in serious bodily injury, as a Class C felony,[2] and involuntary manslaughter, as a Class C felony.[3] Yost testified at his jury trial, which began on June 25, 2018. Yost admitted that he confronted Oxley in the foyer of the union building, argued with Oxley, and punched and kicked Oxley.

[10] Surveillance footage taken at the union hall on December 12, 2013, was admitted into evidence as State's Exhibits 45 and 46. The surveillance footage was played for the jury twice during the trial and once again during the jury's deliberation. Both Yost and Naillieux testified that they had viewed the surveillance footage in Exhibits 45 and 46 and that the footage accurately reflected the altercation between Yost and Oxley.

[11] Dr. John Feczko ("Dr. Feczko"), a forensic pathologist, testified as a medical expert for the State. Dr. Feczko testified that he had reviewed the autopsy report completed by Dr. Kim, and he had also reviewed the photographs and surveillance video taken at the union building on the evening of December 12,

---

[2] I.C. § 35-42-2-1(a)(3) (2014).

[3] I.C. § 35-42-1-4(c)(1) (2014).

2013. The autopsy report noted that Oxley had a number of injuries, including "fresh" lacerations and abrasions on his face, right anterior shoulder, one knee, and one thumb; a contusion hemorrhage surrounding a kidney; a large scalp hemorrhage on the top part of his head; and injuries to his brain. Tr. Vol. V at 91.

[12] Dr. Feczko agreed with Dr. Kim's conclusion that the cause of death was "blunt force trauma due to the head injury with a large scalp hemorrhage." *Id*. at 104. Dr. Feczko would have added that the cause of death was from the cerebral hemorrhage and herniation that resulted from the head injury. He testified that the cerebral hemorrhage caused Oxley's brain to swell, resulting in heart arrhythmia (abnormalities in the heartbeat) and pulmonary edema (swelling of the lungs), both of which resulted in the cessation of breathing and death. Dr. Feczko concluded that the cause of death was "one hundred percent blunt force trauma, cerebral swelling, [and] herniation," and he explained that the slow nature of the swelling of brain cells can lead to death up to a day after the injury, during which time the injured party would still be able to walk and talk and engage in activities. *Id*. at 107-09. Dr. Feczko testified that the surveillance video supported the cause of death, but that he would have come to the same conclusion without the video. He stated that medical records concerning Oxley's pre-existing seizure disorder "100 percent" did not change his opinion on the cause of death. *Id*. at 106-08. Dr. Feczko testified that Oxley did not die from Sudden Unexplained Death in Epilepsy ("SUDEP")

because the hemorrhaging, brain swelling, herniation, and diffuse axonal injuries that were present in Oxley are not seen with seizures.

[13]     Dr. Wayel Kaakaji ("Dr. Kaakaji"), a neurological surgeon, testified as a medical expert for Yost. Dr. Kaakaji reviewed the autopsy report and Oxley's past medical records. Dr. Kaakaji testified that Oxley died from "[b]rain herniation, brain edema [swelling], [and] dysfunction of the lungs." Tr. Vol. VI at 122. He noted that Oxley had been diagnosed with a seizure disorder and had been treated for seizures in 2005, 2008, 2009, and 2011. Dr. Kaakaji opined that the swelling in Oxley's brain could have been caused by SUDEP, although he stated it was "possible" that it was caused by "blunt force trauma." *Id*. Dr. Kaakaji also testified that it would be "very unlikely" that Oxley would have been able to function normally for ten hours if the hemorrhage and brain injury had been caused by someone hitting him in the head. *Id*. at 123-24.

[14]     Prior to closing argument, Yost requested a jury instruction stating: "In determining whether the guilt of the accused is proven beyond a reasonable doubt, you should require that the proof be so conclusive and sure as to exclude every reasonable theory of innocence." App. Vol. II at 196. The trial court denied that request on the grounds that such an instruction is only required when the judge determines that all the evidence of the *actus reus* element of the crime is circumstantial, and that was not true in this case.

[15]     The jury found Yost guilty of aggravated battery and battery resulting in serious bodily injury but not guilty of involuntary manslaughter. At the August 8,

2018, sentencing hearing, the trial court vacated Count II, battery causing serious bodily injury. In sentencing Yost on Count I, aggravated battery, the court noted the following mitigating factors: a minimal criminal history; a long-established work history; a stable family life; support from family and friends; his successful raising of his children; an active religious life; no drug or alcohol problem; the crime is unlikely to recur; Yost is likely to respond affirmatively to probation; and Yost sincerely expressed "profound" remorse. Tr. Vol. VIII at 93; Appealed Order at 1-2. The court also noted that Yost was not a threat to the community; Yost was "an asset to the community and to his family," Tr. Vol. VIII at 94; and long-term incarceration "would not serve any purpose," *id*. The court found as an aggravator that "[t]here may be some anger issues with [Yost]." Appealed Order at 2. The court found "that the mitigators outweigh any aggravators" and sentenced Yost to the ten-year advisory sentence, with six years to be served in the DOC and the other four suspended and served in community corrections. *Id*.; Tr. Vol. VIII at 94-95. The court stated that it gave the advisory[4] sentence, despite the mitigating circumstances, because the crime resulted in a death. Tr. Vol. VIII at 99. This appeal ensued.

---

[4] The trial court erroneously referred to the advisory sentence as the "presumptive" sentence. *Id*.

# Discussion and Decision

## Sufficiency of the Evidence

[16]    Yost challenges the sufficiency of the evidence to support his conviction. Our standard of review of the sufficiency of the evidence is well-settled:

> When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*.

*Clemons v. State*, 996 N.E.2d 1282, 1285 (Ind. Ct. App. 2013), *trans. denied*.

[17]    To support Yost's conviction of aggravated battery, the State was required to prove that Yost (1) knowingly or intentionally (2) inflicted injury on Oxley (3) that created a substantial risk of death. I.C. § 35-42-2-1.5. Yost admits that he knowingly or intentionally inflicted injury on Oxley, but he maintains that he did not intend to inflict injury that created a substantial risk of death. However, "the severity of the injury is not an element of the prohibited conduct, but a result of it." *Lowden v. State*, 51 N.E.3d 1220, 1223 (Ind. Ct. App. 2016), *trans. denied*. Therefore, the only intent the State was required to prove was that Yost knowingly or intentionally inflicted injury upon Oxley; it was not required to prove that Yost knew he would cause serious bodily injury. *Id*.

[18]     The only question, then, is whether there is sufficient evidence that the injury Yost inflicted caused serious bodily injury, i.e., "'a protracted loss or impairment of the function of a bodily member or organ.'" *Id*. (quoting *Mann v. State*, 895 N.E.2d 119, 124 (Ind. Ct. App. 2008). The State presented sufficient evidence that the punches and/or kicks Yost inflicted on Oxley caused the cerebral hemorrhage that resulted in brain swelling and Oxley's death. Both the autopsy completed by Dr. Kim and the testimony of Dr. Feczko provide sufficient support for that conclusion. Yost's contentions to the contrary are merely requests that we reweigh the evidence and judge witness credibility, which we cannot do. *Clemons*, 996 N.E.2d at 1285.

[19]     Yost contends that, because the jury found him not guilty of involuntary manslaughter, that means "the jury determined that Yost's battery did not result in the brain swelling that produced Oxley's unfortunate death." Appellant's Br. at 19. Essentially, Yost argues that his battery conviction cannot stand because it is inconsistent with the not guilty verdict on involuntary manslaughter. However, as our Supreme Court has noted, when a jury returns logically inconsistent verdicts, it is

> likely that the jury chose to exercise lenity, refusing to find the defendant guilty of one or more additionally charged offenses, even if such charges were adequately proven by the evidence. Such right of a criminal jury to decline to convict is well recognized.

*Beattie v. State*, 924 N.E.2d 643, 648 (Ind. 2010) (citations omitted). Thus, "[j]ury verdicts in criminal cases are not subject to appellate review on grounds

that they are inconsistent, contradictory, or irreconcilable." *Id*.; *see also Baber v. State*, 870 N.E.2d 486, 490 (Ind. Ct. App. 2007) (citation omitted) ("A jury verdict may be inconsistent [with other verdicts] or even illogical but nevertheless permissible if it is supported by sufficient evidence."), *trans. denied*.

[20] There was sufficient evidence to support Yost's conviction.[5]

# Jury Instruction

[21] Yost challenges the trial court's denial of his request to include the "reasonable theory of innocence" language in the jury instructions.

> Because instructing the jury is a matter within the sound discretion of the trial court, we will reverse a trial court's decision to tender or reject a jury instruction only if there is an abuse of that discretion. *Washington v. State*, 997 N.E.2d 342, 345 (Ind. 2013). We determine whether the instruction states the law correctly, whether it is supported by record evidence, and whether its substance is covered by other instructions. *Id*. at 345–46. "Jury instructions are to be considered as a whole and in reference to each other; error in a particular instruction will not result in reversal unless the entire jury charge misleads the jury as to the law in the case." *Whitney v. State*, 750 N.E.2d 342, 344 (Ind. 2001) (quoting *Edgecomb v. State*, 673 N.E.2d 1185, 1196 (Ind. 1996)).

*Pattison v. State*, 54 N.E.3d 361, 365 (Ind. 2016).

---

[5] Because the trial court vacated Yost's Count II conviction of battery resulting in serious bodily injury and we find sufficient evidence of the aggravated battery conviction, we do not address the sufficiency of the evidence of Count II.

[22] The "reasonable theory of innocence" instruction must be given to the jury only when the evidence of the *actus reus* is wholly circumstantial. *Hawkins v. State*, 100 N.E.3d 313, 316 (Ind. Ct. App. 2018) (citing *Hampton v. State*, 961 N.E.2d 480 (Ind. 2012)). The *actus reus* is the conduct required for the commission of the crime. *Hampton*, 961 N.E.2d at 491; *see also Hawkins*, 100 N.E.3d at 317 n.3 ("*Actus reus* is '[t]he wrongful deed that comprises the physical components of a crime and that generally must be coupled with *mens rea* to establish criminal liability.' Black's Law Dictionary 44 (10th ed. 2014)"). Here, the *actus reus* was the act of Yost hitting and kicking Oxley, and there was direct evidence[6] of those actions in the form of Yost's admissions, the testimony of eyewitnesses, and the footage from the surveillance cameras. Thus, Yost is mistaken when he claims the *actus reus* was proven solely with circumstantial evidence. The trial court did not abuse its discretion when it denied Yost's request for the reasonable theory of innocence jury instruction.

## Abuse of Discretion in Sentencing

[23] Yost maintains that the trial court erred in sentencing him. Sentencing decisions lie within the sound discretion of the trial court. *Cardwell v. State*, 895

---

[6] In *Hawkins v. State*, we explained:

> [D]irect evidence is "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." Black's Law Dictionary 675 (10th ed. 2014). Circumstantial evidence, on the other hand, is "[e]vidence based on inference and not on personal knowledge or observation."

100 N.E.3d at 317 (citing *Hampton* 961 N.E.2d at 674).

N.E.2d 1219, 1222 (Ind. 2008).  An abuse of discretion occurs if the decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom."  *Gross v. State*, 22 N.E.3d 863, 869 (Ind. Ct. App. 2014) (citation omitted), *trans. denied*. A trial court abuses its discretion in sentencing if it does any of the following:

> (1) fails "to enter a sentencing statement at all;" (2) enters "a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any[ ]—but the record does not support the reasons;" (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration;" or (4) considers reasons that "are improper as a matter of law."

*Id*. (quoting *Anglemyer v. State*, 868 N.E.2d 482, 490-491 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007)).

[24]   So long as a sentence is within the statutory range, the trial court may impose it without regard to the existence of aggravating or mitigating factors.  *Anglemyer*, 868 N.E.2d at 489.  However, if the trial court does find the existence of aggravating or mitigating factors, it must give a statement of its reasons for selecting the sentence it imposes. *Id*. at 490.  But the relative weight or value assignable to reasons properly found, or those which should have been found, is not subject to review for abuse of discretion. *Gross*, 22 N.E.3d at 869.

[25]     Yost contends that the trial court abused its discretion when it imposed the advisory sentence[7] even though it specifically found that the mitigating circumstances outweighed the aggravating circumstances. However, I.C. § 35-38-1-7.1(d) allows the imposition of any sentence that does not exceed statutory or constitutional limits, "regardless of the presence or absence of aggravating circumstances or mitigating circumstances," and the relative weight the trial court gives to those circumstances is not reviewable. *Gross*, 22 N.E.3d at 869. Moreover, the trial court specifically noted that it imposed the advisory sentence, despite the mitigating circumstances, because the crime resulted in a death. Tr. Vol. VIII at 99. Death of the victim as an aggravator was a permissible consideration. *See Paul v. State*, 888 N.E.2d 818, 823 (Ind. Ct. App. 2008) ("'Death' is not a necessary element of the offense of aggravated battery as a class B felony [and] it is a valid aggravating factor."), *trans. denied*; *see also* I.C. § 35-38-1-7.1(a)(1) (providing that the fact that the "harm, injury, loss, or damage suffered by the victim was significant, and greater than the elements necessary to prove the commission of the offense" is a statutory aggravating factor).

---

[7] We note Yost was given the advisory sentence of ten years, but four of those years were suspended to community corrections. Thus, Yost is serving only six years in prison, and we note that six years is the minimum sentence for a Class B felony. I.C. § 35-50-2-5 (2014).

The trial court did not abuse its discretion when it imposed the advisory sentence for aggravated battery, with four years of the sentence suspended to community corrections.

## Appellate Rule 7(B)

Even when a trial court has not abused its discretion in sentencing, Article 7, Sections 4 and 6, of the Indiana Constitution authorize independent appellate review and revision of a trial court's sentencing order. *E.g.*, *Livingston v. State*, 113 N.E.3d 611, 613 (Ind. 2018). This appellate authority is implemented through Indiana Appellate Rule 7(B). *Id*. Revision of a sentence under Rule 7(B) requires the appellant to demonstrate that his sentence is inappropriate in light of the nature of his offenses and his character. *See* Ind. Appellate Rule 7(B); *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate. *Gibson v. State*, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006). However, "a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." *Roush*, 875 N.E.2d at 812 (alteration original). And the defendant "bears a particularly heavy burden in persuading us that his sentence is inappropriate when the trial court imposes the advisory sentence." *Fernbach v. State*, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011), *trans. denied*.

[28]     Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell*, 895 N.E.2d at 1224. The principal role of appellate review is to attempt to "leaven the outliers." *Id*. at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id*. at 1224. The question is not whether another sentence is more appropriate, but rather whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[29]     We agree with Yost that there is evidence that his actions in committing the offense were no more egregious than necessary to establish the elements of the offense; however, we cannot overlook the fact that the resulting harm was a death. *Cardwell*, 895 N.E.2d at 1224. We also agree that there was ample evidence of Yost's good character—specifically, the mitigating circumstances the trial court discussed. But Yost was only given the advisory sentence for aggravated battery, and the advisory sentence "is the starting point the Legislature selected as appropriate for the crime committed." *Fuller v. State*, 9

N.E.3d 653, 657 (Ind. 2014). Moreover, "[a]side from revising the length of a sentence, the place where a sentence is to be served is also an appropriate focus for our review under 7(B)." *Livingston*, 113 N.E.3d at 613; *see also Serban v. State*, 959 N.E.2d 390, 393 (Ind. Ct. App. 2012) (noting that, in reviewing a sentence, we consider the "full sentence, taking into consideration that a portion of it was suspended."). The trial court only sentenced Yost to six years in the Department of Correction, with the remaining four years suspended to community corrections. We cannot say that the advisory sentence—only a portion of which is to be served in prison—is inappropriate. *See id*.

# Conclusion

[30] The State provided sufficient evidence to support Yost's conviction of aggravated battery. And the trial court did not abuse its discretion when it denied Yost's requested jury instruction regarding a reasonable theory of innocence or when it imposed the advisory sentence for aggravated battery. Finally, we cannot say that Yost's sentence is inappropriate.

[31] Affirmed.

Riley, J., and Pyle, J., concur.